IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, | * * * | |
| Plaintiff, | * * | Civil No. JFM-05-2267 |
| v. | * * | |
| COLONIAL PIPELINE COMPANY, | * * | |
| Defendant. | * | |

**OPINION**

Colonial Pipeline Company ("Colonial") operates pipelines along the East Coast that carry oil from Texas north to New Jersey. These include three pipelines that cross property owned by the National Railroad Passenger Corporation ("Amtrak") in Anne Arundel County, and one that crosses property owned by Amtrak in Baltimore County. This action arises out of failed negotiations to renew the license agreements under which Colonial has used and occupied Amtrak's property for its pipelines.

In its complaint Amtrak asserts claims for trespass and unjust enrichment and seeks damages for Colonial's continued use of the properties without paying any license fee. Colonial has filed counterclaims in which it attempts to condemn the Amtrak properties by invoking its eminent domain power under Maryland law. Amtrak has filed a motion to dismiss the counterclaims. The motion will be granted.[1]

---

[1]Colonial has filed with its opposition to Amtrak's motion to dismiss a motion for leave to file amended counterclaims in which Colonials seeks (1) to withdraw a claim it initially asserted that Amtrak does not have any ownership interest in the properties in question, and (2) add factual allegations regarding its condemnation claims. Although the motion to amend could

I.

Amtrak's primary contention is that § 5-404 permitting oil pipeline companies such as Colonial to condemn properties for the purpose of operating pipelines and appurtenances existing prior to July 1, 1978 is preempted by federal law insofar as Amtrak is the owner of the properties sought to be condemned.[2] In support of this contention, Amtrak cites two federal statutes: the Regional Rail Reorganization Act ("Rail Act") and the Rail Passenger Service Act ("RPSA"). According to Amtrak, because the properties in question were conveyed to Amtrak by Congress through the Rail Act, and because Amtrak was given various Congressional mandates regarding the use of those properties in providing intercity passenger rail service in the RPSA, permitting condemnation of Amtrak property under state eminent domain law would

---

be denied in its second respect on the ground of futility, I will, instead, grant the motion and consider the additional factual allegations in granting Amtrak's motion to dismiss.

[2] In addition to its preemption argument, Amtrak claims that 1) Maryland law cannot be used to condemn federally-owned property and 2) Amtrak cannot cause impairment of a federal mortgage.

The Supreme Court has clearly ruled that the states may not exercise any power that interferes with the federal government's control over its own property. *Utah Power & Light Co. v. U.S.*, 243 U.S. 389, 403-04 (1917). However, Amtrak has not established the extent to which its properties truly are federal in nature. Instead, Amtrak relies on Congress's appropriation and conveyance of the properties to argue: "[i]f Colonial is permitted to condemn an interest in Amtrak's property, it will be using state law to restrict Congress' intended disposition of this property". Mot. to Dismiss at 14. This appears to simply be a restatement of Amtrak's preemption argument: the federal government conveyed those properties to Amtrak for satisfaction of a federal purpose, and if state law was permitted to condemn them, it would frustrate or limit the federal purpose.

Amtrak also relies on the mortgage held by the federal government on all of Amtrak's property, stating that the mortgage is "intended to secure the federal government's heavy financial investment in Amtrak and its property." Mot. to Dismiss at 21. Again, this is essentially a preemption argument, and Amtrak acknowledges as much by relying on two Fifth Circuit cases holding on preemption grounds that a state law could not be used to condemn federally-mortgaged property. *Id.* at 21-21 (citing *Morgan City v. South La. Elec. Coop.*, 31 F.3d 319 (5th Cir. 1994), *cert. denied*, 516 U.S. 908 (1995); *City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057 (5th Cir. 1987)).

"intrude on an area" under pervasive federal regulation and would "interfere with the achievement of a federal policy." *Id.* at 7. For these reasons, Amtrak says, "no court has ever allowed a state agency to condemn the real property or facilities of Amtrak." *Id.* (quoting *UGI Utilities, Inc. v. National Railroad Passenger Corp.*, No. 02-1230, slip op. at 6 (M.D. Pa. filed July 2, 2004)).

A.

Preemption cases involving Amtrak pose unusual questions because of Amtrak's intermediate position between a truly private entity and an arm of the federal government. The Rail Act accomplished the initial appropriation of properties for use in a national passenger rail system and conveyed them to the private state-incorporated corporation, Consolidated Rail Corporation ("Conrail"). 45 U.S.C. § 701, *et seq*. As explained by the Supreme Court, the Rail Act was a response to the "rail transportation crisis" that "seriously threaten[ed] the national welfare" when eight of the major northeast and midwest railroads filed bankruptcy proceedings. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 108-09 (1974). Congress determined that the best means of preserving passenger rail service was "reorganization of the railroads ... into a single, viable system operated by a private, for-profit corporation." *Id.*

To advance that reorganization, the appropriated properties were transferred to Amtrak in 1971 by means of the RPSA. 49 U.S.C. § 24101, *et seq*. The RPSA defines Amtrak's purpose as follows: to "provide intercity and commuter rail passenger transportation that completely develops the potential of modern rail transportation to meet the intercity and commuter passenger transportation needs of the United States." 49 U.S.C. § 24101(b).

Amtrak is therefore a private, for-profit corporation that is entrusted with a federally-defined duty to provide rail service for the common good. By virtue of that status, it is neither

fully private nor fully federal in nature.  Although Amtrak is not a federal agency or other body and is in fact explicitly designated as independent of the federal government, 49 U.S.C. § 24301(a)(3), the Supreme Court has held that Amtrak bears the same duty not to violate constitutionally-guaranteed rights as the federal government.  *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 400 (1995) (holding that although its authorizing statute explicitly makes it separate from the federal government, Amtrak is "part of the Government for purposes of the First Amendment" because it was created "by special law, for the furtherance of governmental objectives" and the federal government "retain[ed] for itself permanent authority to appoint a majority of the directors").

In addition, Congress has mandated certain duties and responsibilities for Amtrak.  In *Lebron*, the Court noted that "Amtrak was created ... explicitly for the furtherance of federal governmental goals."  *Id.* at 397.  Most pertinent to this case is Amtrak's duty to "maximize the use of its resources, including the most cost-effective use of employees, facilities and real property."  49 U.S.C. § 24101(c)(11).  Also relevant is Amtrak's obligation to "use its best business judgment in acting to minimize United States Government subsidies".  49 U.S.C. § 24101(c)(1).  To achieve these obligations, Amtrak is encouraged to "make agreements with the private sector and undertake initiatives that are consistent with good business judgment and designed to maximize its revenues and minimize Government subsidies."  49 U.S.C. § 24101(d).  Thus, Amtrak was created in order to achieve goals set out by the federal government, and state laws that infringe upon satisfaction of those goals may implicate the Supremacy Clause and be subject to a preemption defense.

B.

As a general matter, federal preemption has been found in three circumstances: 1)

explicit preemption, 2) field preemption, and 3) conflict preemption. *English v. General Electric Co.*, 496 U.S. 72, 78-79 (1990). Although these divisions are somewhat artificial, they serve to provide a framework for analysis in preemption cases. *Id.* at 79 n.5. In this case, while Amtrak advances arguments that could fit within each of the three categories, conflict preemption is most applicable.

Conflict preemption applies "where it is impossible for a private party to comply with both state and federal requirements or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'". *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (other internal citations omitted)). Citing the opinion in *UGI*, Amtrak argues that an exercise of Maryland eminent domain power here would be an obstacle to its successful execution of Congress's mandate.

In *UGI*, a Pennsylvania public utility natural gas company (UGI) sought to condemn property on which Amtrak owned and operated tracks and under which UGI had existing gas pipelines. *UGI Utilities, Inc. v. National Railroad Passenger Corp.*, No. 02-1230 (M.D. Pa. filed July 2, 2004). The *UGI* court, facing a factual scenario almost identical to the case at hand, relied on conflict preemption to justify granting summary judgment to Amtrak. The court found an actual conflict between the condemnation action and the RPSA and Rail Act, but noted that "[w]hether the basis of preemption was the RPSA, the Rail Act, or another federal statute, no court has ever allowed a state agency to condemn the real property or facilities of Amtrak." *Id.* at 10.[3]

---

[3]Colonial notes in its opposition memorandum that the *UGI* court failed to consider the mortgage held by the federal government on Amtrak's property, which expressly contemplates condemnation actions. Mem. in Opp'n at 4-5. The mortgage does, as Colonial points out, provide for the mortgagor's (Amtrak's) entitlement to "all compensation, awards, damages, claims, rights of action and proceeds" arising out of a condemnation action (Mortgage, Mem. in

The court cited Amtrak's duty to "maximize the use of its resources, including the most cost-effective use of ... [its] real property", and explained that "Congress 'encouraged [Amtrak] to make agreements with the private sector and undertake initiatives that are consistent with good business judgment and designed to maximize revenues and minimize Government subsidies,'" then found that condemnation would interfere with the achievement of those goals. *Id.* at 9 (citing 49 U.S.C. §§ 24101(c)(11) and 24101(d)).  To permit UGI to condemn Amtrak's property would interfere w/Amtrak's "right and obligation to determine the best use of its real property", even though (as is the case here) UGI and Amtrak could both use the property at the same time.  *Id.* at 11.  The court noted that the lack of conflict between Amtrak's railroad use and UGI's pipeline use was irrelevant, because permitting condemnation would limit Amtrak's ability to profit from the land, and to achieve its congressionally mandated goal of "maximiz[ing] revenues and minimiz[ing] Government subsidies." *Id.* at 9.

A similar situation was addressed by the Eighth Circuit in *Union Center Redevelopment Corp. v. National Railroad Passenger Corp.*, 103 F.3d 62 (8th Cir. 1997).  There, Amtrak had used its own condemnation powers under 45 U.S.C. § 545(d) to obtain the property in question and planned to construct a station on the property.  *Id.* at 63.  Funding for the station subsequently fell through, and at the time the case arose Amtrak was leasing the property to a third party as a parking lot.  Union Center Redevelopment Corporation sought to condemn the property under Missouri eminent domain law, which provided that an urban redevelopment corporation had the power to take "property already devoted to public use".  *Id.* at 66 (citing

---

Opp'n ex. 1, § 1.07).  However, this provision does not itself permit state condemnation of Amtrak properties.  It merely protects Amtrak interests if such a state condemnation action were permitted.  Moreover, even if the mortgage were read as granting such permission, it would be *ultra vires* because only Congress may limit the scope of preemption.

Mo.Rev.Stat. § 353.130.3).  Like the *UGI* court, the *Union Center* court relied on an implied conflict preemption basis for refusing to permit condemnation under Missouri state law.  The court noted that even though Union Center advanced a competing public purpose, condemnation would "frustrat[e] Amtrak's ability to accomplish its federal mandate of creating a nationwide rail system".  *Id.* at 65.  The court was not swayed by Union Center's argument that Amtrak no longer had any concrete plans to use the property in question for a rail station, because Amtrak could develop plans to use the property for a rail station in the future.

C.

Colonial responds to Amtrak's arguments first by focusing on an alternative basis for conflict preemption advanced by Amtrak: that condemnation would conflict with "what [Amtrak] says was Congress's intent that Amtrak should hold these properties free and clear of any liens and encumbrances."  Mem. in Opp'n at 24.  Colonial points out that 45 U.S.C. § 743(b) explicitly makes Amtrak's properties subject to any previous leases and agreements.  *Id.* (citing 45 U.S.C. § 743(b) ("All rail properties conveyed ... shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority ... *for the continuance of rail passenger service* or any lien or encumbrance of no greater than 5 years' duration which is necessary ... *related to public health or sanitation*.") (emphasis added)).  Therefore, Colonial argues, Congress did not intend to keep Amtrak's properties free of liens and encumbrances, and there is thus no conflict preemption.

Colonial's argument misses the mark for three reasons.  First, the statute makes Amtrak's properties subject to leases and agreements that are *already existing*.  This does not necessarily

indicate that Congress intended for Amtrak's properties to be subject to future easements or licenses. Second, the statute makes the properties subject to leases and agreements that further two public interests: rail passenger service and public health or sanitation. Colonial's oil pipeline service is related to neither. Third, the argument does not address at all what I consider to be the critical issue: Amtrak's mandate to use its properties in the most efficient, productive, and profitable manner.

As to that issue, Colonial, quoting the same provisions cited by Amtrak establishing Amtrak's responsibility to make profitable use of its properties (Mem. in Opp'n at 25-27), argues that the "goals" in § 24101(c) are "nothing more than Congress's aspirational hope that Amtrak will use good business judgment in its operations" (Mem. in Opp'n at 28). Colonial cites *Lebron* in support of the proposition that Congress simply hopes that Amtrak will be profitable, and contends that Amtrak has no duty to "charge as much as possible for Colonial's crossing rights." *Id.* According to Colonial, because § 24101(c) merely defines goals, and the mortgage between Amtrak and the United States allows Amtrak to grant easements for "a fair and reasonable" compensation (Mortgage, Mem. in Opp'n ex. 1, § 1.09(a)(2)), "the Court in *UGI*, ... was wrong in holding that the condemnation there was preempted." Mem. in Opp'n at 28.

This reasoning suggests that a state law condemnation against Amtrak in which it is required to convey property in return for an award of fair and reasonable compensation and the granting of easements by Amtrak for fair and reasonable compensation are identical. This simply is not the case. The difference between the two is the identity of the authority who decides what constitutes "fair and reasonable compensation." In the first scenario, it is a judge or jury. In the second, it is Amtrak itself. This difference is critical because under the statutory scheme the duty is imposed upon Amtrak to "maximize the use of its resources, including the

most cost-effective use of employees, facilities and real property," 49 U.S.C. § 24101(c0(11), and to "use its best business judgment in acting to minimize United States Government subsidies."  49 U.S.C. § 24101(c)(1).  The necessity of conferring sufficient power upon Amtrak to meet these duties  is reinforced by the Findings outlined in the Amtrak Reform and Accountability Act of 1997, by which "immediate action" in order to "improve Amtrak's financial condition" was taken.  Amtrak Reform and Accountability Act of 1997, Pub. L. No. 105-134, § 2, 111 Stat. 2570, 2571 (1997).  These Findings emphasize that "Amtrak is facing a financial crisis" and that "additional flexibility is needed to allow Amtrak to operate in a businesslike manner in order to manage costs and maximize revenues."  *Id.*

In sum, if Amtrak were ordered to convey property to an oil pipeline company under the mandate of state condemnation law, it would be divested of powers conferred upon it by Congress, and its ability to achieve duties conferred upon it by federal law would be compromised.  Thus, the eminent domain counterclaims asserted by Colonial are preempted and will be dismissed.  A separate order to that effect is being entered herewith.


Date: January 31, 2006              /s/_____
                                    J. Frederick Motz
                                    United States District Judge